IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO RIVER VALLEY ENVIRONMENTAL
COALITION, INC., and WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,

            Plaintiffs,

v.                                          CIVIL ACTION NO. 3:09-0149

KENNETH SALAZAR,
Secretary of the Interior,

            Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiffs' Motion for Summary Judgment (Doc. 45), Intervenor West Virginia Department of Environmental Protection's Motion for Summary Judgment (Doc. 53), Intervenor West Virginia Coal Association's Cross-Motion for Summary Judgment (Doc. 55), and Defendant's Cross-Motion for Summary Judgment (Doc. 56). All issues have been fully briefed, and are ripe for adjudication. For the following reasons, Plaintiffs' motion is **DENIED** and Defendant and Intervenors' motions are **GRANTED**.

**I. Background**

**A.**     **Statutory Framework**

At issue is West Virginia's statutory and regulatory program under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328 ("SMCRA" or "the Act"). Subject to the approval of the Secretary of the Interior ("Secretary") through the Office of Surface Mining ("OSM"), a state may assume jurisdiction for a program regulating surface mining operations. 30

U.S.C. §1211(c)(1). Approval or disapproval of a state program must comply with the requirements of § 1253 and the regulations promulgated pursuant to the Act. 30 U.S.C. § 1253; 30 C.F.R. § 732.15. Once approved, any amendments to the program are subject to the same approval process. 30 C.F.R. § 732.17(h)(10). Among these requirements, amendments to a state's program must be "in accordance with the provisions of the Act and consistent with the requirements of the Chapter." 30 C.F.R. 732.15(a). "Consistent with" and "in accordance with" are further defined:

> Consistent with and in accordance with mean:
> (a) With regard to the Act, the State laws and regulations are no less stringent than, meet the minimum requirements of and include all applicable provisions of the Act.
> (b) With regard to the Secretary's regulations, the State laws and regulations are no less effective than the Secretary's regulations in meeting the requirements of the Act.

30 C.F.R. § 730.5. Therefore, at a minimum, in order to comply with SMCRA and its corresponding regulations, a state program's statutes and regulations must be no less stringent than SMCRA and no less effective than the federal regulations. In addition to these substantive requirements, there are procedural requirements for the submission and approval of amendments to state programs. OSM must provide public notice of the amendment, allow for a public comment period, and provide notice of any public hearings held. 30 C.F.R. 732.17(h)(2).

The focus of this case is the requirement for a cumulative hydrologic impact assessment ("CHIA"). When applying for a surface mining permit, the applicant must determine the probable hydrologic consequences of the proposed operations, both on the mine site and on the surrounding area. 30 C.F.R. § 780.21(f). This determination is used by the regulatory agency to conduct a CHIA on the "cumulative impact area" in order to ascertain "whether the proposed operation has been designed to prevent material damage to the hydrologic balance outside the permit area." 30 C.F.R. § 780.21(g)(1). West Virginia's program under the SMCRA was initially approved on January 21,

1981.  AR 215.  Since then, several amendments have been submitted and approved.  *Id.*  The most recent of these, submitted on March 22, 2007, is at issue in this case.

**B.**     **West Virginia's Program Amendments**

The Secretary approved West Virginia's proposed amendments to its program, deleting its definition of "cumulative impact" and adding a definition for "material damage to the hydrologic balance outside the permit areas."  There are no corresponding federal definitions for either of these terms.  AR 216.  The definition of "cumulative impact" deleted by the amendment was:

> Cumulative impact means the hydrologic impact that results from the cumulation of flows from all coal mining sites to common channels or aquifers in a cumulative impact area.  Individual mines within a given cumulative impact area may be in full compliance with effluent standards and all other regulatory requirements, but as a result of the co-mingling of their off-site flows, there is a cumulative impact.  The Act does not prohibit cumulative impacts but does emphasize that they be minimized.  When the magnitude of cumulative impacts exceeds threshold limits or ranges as predetermined by the Division, they constitute material damage.

AR 32.  The amendments also added the following definition for "material damage to the hydrologic balance outside the permit area":

> Material damage to the hydrologic balance outside the permit areas means any long term or permanent change in the hydrologic balance caused by surface mining operation(s) which has a significant adverse impact on the capability of the affected water resource(s) to support existing conditions and uses.

AR 32–33.

**C.**     **Procedural Background**

The West Virginia amendments have been considered by this Court before.  On May 2, 2001, West Virginia Department of Environmental Protection ("WVDEP") initially submitted proposed amendments to the West Virginia program pursuant to the SMCRA.  AR 215.  These were approved by the OSM on December 1, 2003.  *Id.*  Ultimately, this Court vacated and remanded the

amendments on September 30, 2005, finding that the requirements of the Administrative Procedure Act ("APA") had not been complied with. *Ohio River Valley Envtl. Coal., Inc. v. Norton*, 2005 WL 2428159 (S.D. W. Va. Sept. 30, 2005). Specifically, this Court found that the Secretary failed to provide a reasoned analysis for the basis of the decision that the amendments were no less effective than the federal regulations. *Norton*, 2005 WL 2428159 at *3. This was affirmed by the Fourth Circuit. *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006). The Fourth Circuit emphasized the obligation of the OSM to "to find not only that the amended program contains counterparts to all federal regulations, but also that it is no less stringent than SMCRA and no less effective than the federal regulations in meeting SMCRA's requirements." *Id.* at 103.

Following these court decisions, West Virginia resubmitted the same amendments to the Secretary of the Interior on March 22, 2007. AR 216. West Virginia included an explanatory letter, particularly focusing on the question of whether the proposed amendments were as stringent as their federal counterpart. AR 31–43. The Secretary provided public notice of receipt in the Federal Register on May 17, 2007, and invited public comment through June 18, 2007. AR 216. The OSM approved the amendments on December 24, 2008. AR 215. Plaintiffs filed this action on February 18, 2009, challenging the Secretary's approval of the amendments as arbitrary and capricious, and as lacking an adequate explanation of the basis for the approval. *Compl.* ¶ 59, Doc. 1. Plaintiffs seek retention of the "cumulative impact" definition, and to have the "material damage" definition vacated. *Id.* ¶ C.

## II. Legal Standards

**A.     Summary Judgment Standard**

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

**B.     Judicial Review Standard**

Federal administrative agencies are subject to the provisions of the Administrative Procedure Act, which establishes the scope of judicial review of challenged agency actions. The Act instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). Because of their expertise in their particular fields, a presumption of validity attaches to an agency's actions. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). As a result, the "ultimate standard of review is a narrow one." *Id.* at 416. In applying this standard, a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* The court also considers whether the agency articulated a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). The connection must be established even where, as here, an agency is rescinding a rule it was not originally required to enact. The Supreme Court has held that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). This reasoned analysis must be provided by the agency itself at the time of the action, as "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Id.* at 50. If the court finds the agency has established this rational connection, the action must be upheld even if the court disagrees with the agency's decision. "A court is not empowered to substitute its judgment for that of the agency." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citing *Overton Park*, 401 U.S. at 416). The final inquiry is whether the agency followed the required procedures. *Overton Park*, 401 U.S. at 417. Here, that inquiry incorporates an analysis of whether the approved amendments are no less stringent than the SMCRA and no less effective than the federal regulations**.** If the Secretary demonstrated a "clear error of

judgment" in approving amendments that did not comply with this requirement, the Court must find his action unlawful. *Overton Park*, 401 U.S. at 416.

### III. Discussion

Plaintiffs argue that the Secretary's approval of the amendments violates the SMCRA, and, therefore, was arbitrary and capricious. Plaintiffs rely on § 1292(a)(3) of the Act, which states: "Nothing in [the SMCRA] shall be construed as superseding, amending, modifying, or repealing" the Clean Water Act ("CWA") "or with any rule or regulation promulgated thereunder." 30 U.S.C. § 1292(a)(3). Plaintiffs contend that the amendments contravene the CWA in two ways. First, the material damage definition only cites existing uses of potentially affected water resources, but not designated uses. *Pls.' Mem. in Supp. Pls.' Mot. Summ. J.* 2, Doc. 46. Second, the amendment excludes those violations of water quality standards that are not "long term" or "permanent." *Id.* at 7. In sum, Plaintiffs argue, because the Secretary and state regulators may not construe the SMCRA to supercede the CWA and its regulations, they "must use applicable EPA-approved State water quality standards as material damage criteria in conducting CHIAs." *Id.* at 9. The Court will first discuss Plaintiffs' contention that the material damage definition does not incorporate designated uses under the water quality standards, and then turn to Plaintiffs' broader argument that the amendments violate § 1292(a)(3). As there are no material facts at issue, the Court finds that summary judgment is proper in this case.

**A.    Secretary's Finding that the Material Damage Definition Incorporates Designated Uses Is Not a Clear Error of Judgment**

Plaintiffs' assertion that the new definition of material damage does not include designated uses is based on the phrase "capability of the affected water resource(s) to support *existing conditions and uses*." AR 33 (emphasis added). In its explanatory letter, West Virginia states that

this phrase "effectively requires the State to consider the water quality standards it has promulgated pursuant to § 303(a) of the federal Clean Water Act as part of the material damage inquiry under surface mining law." AR 36. In those regulations, West Virginia differentiates between designated and existing uses in its definitions section:

> 2.3 "Designated uses" are those uses specified in water quality standards for each water body or segment whether or not they are being attained. (See sections 6.2–6.6, herein)
> \*    \*    \*
> 2.5 "Existing uses" are those uses actually attained in a water body on or after November 28, 1975, whether or not they are included in the water quality standards.

W. Va. Code St. R. § 47-2-2. The term "water quality standards", however, is defined as "the combination of water uses to be protected and the water quality criteria to be maintained by these rules." W. Va. Code St. R. § 47-2-2.21. Water quality criteria is defined as the "levels of parameters or stream conditions that are required to be maintained by these regulations. Criteria may be expressed as a constituent concentration, levels, or narrative statement, representing a quality of water that supports a *designated use or uses*." W. Va. Code St. R. § 47-2-2.20 (emphasis added).

West Virginia has represented that the SMCRA program amendment does require the state to consider these standards and, therefore, designated uses of water resources will be considered in determining whether material damage to the hydrologic balance will occur. Accordingly, in its explanatory letter, West Virginia asserted the following:

> If upon review of a permit application and assessment of the probable cumulative impact of all anticipated mining in the cumulative impact area on the hydrologic balance, the DEP is able to determine that the proposed operation has been designed so as to consistently comply with the water quality standards that protect the uses of the water into which discharges from the operation will flow, the DEP will make a finding that the proposed operation has been designed so as to prevent material damage to the hydrologic balance outside the permit area.

AR 37. OSM, in its explanation of the basis for its approval of the amendments, relied on this representation. The question is whether the Secretary demonstrated a clear error of judgment in finding that West Virginia's assertion that it would consider the water quality standards sufficient for approval of the material damage definition.

As there is no federal counterpart to the "material damage" definition, OSM identified the standard to determine whether the definition was no less stringent than the SMCRA and no less effective than the federal regulations as follows: "[W]hether the definition proposed by West Virginia limits the reach of material damage in a way that reduces the effectiveness of its program so that it would be less effective than Federal rules in achieving the purposes of SMCRA." AR 219. In its analysis of the phrase "support existing conditions and uses" in the material damage definition, the OSM relied upon the representation of West Virginia in its explanatory letter. Building on its water quality standards regulatory framework, West Virginia asserted that

> under the proposed definition, in order to assure that mining will not result in a long term or permanent change in the hydrologic balance which has a significant adverse impact on the capability of a receiving stream to support its uses, a proposed mining operation must be designed so as to consistently comply with the water quality standards for the designated uses for the receiving stream.

AR 220. OSM determined that, even though the definition does not explicitly incorporate designated uses, as a practical matter, application of the definition will utilize these criteria because protected uses under the water quality standards include designated uses. In particular, OSM found that "[b]y including its Water Quality Standards with the amendment, we understand that West Virginia intends to apply the requirements set forth . . . when determining when material damage to the hydrologic balance has occurred." *Id.*

OSM also found that the connection of the material damage definition to the water quality standards was "not inconsistent" with the link between the federal water monitoring requirements under the SMCRA regulations, 30 C.F.R. §§ 780.21 and 784.14, and detection of material damage. AR 220. These regulations require that "current and approved postmining land use" should be considered in developing criteria for monitoring surface and ground water, which is used to determine whether or not material damage is occurring. AR 217, 220. To OSM, the logic behind tying the monitoring requirements to postmining land use is akin to the logic of tying the material damage definition to existing water uses. This link is strengthened by West Virginia's explanation of how the definition is to be applied, "since water quality standards established under the Clean Water Act are linked to both existing and designated uses." AR 220. Further, as the water quality standards do not apply to surface water quantity or ground water quality or quantity, OSM noted that the material damage definition must allow room for the development of additional criteria to consider in determining material damage. OSM concluded that the definition "does not limit West Virginia's authority or obligation to do so." *Id.* On the basis of this conclusion and its reliance on West Virginia's incorporation of its water quality standards into the definition, OSM concluded that the West Virginia definition does not "limit[] the reach of material damage in a way that reduces the effectiveness of its program so that it would be less effective than Federal rules in achieving the purposes of SMCRA." AR 219–20.

The Environmental Protection Agency ("EPA") in its concurrence expressed concern that the "amendments may be subject to interpretations that would be inconsistent with the CWA . . . ." AR 208. The agency, like the plaintiffs, emphasized that "water quality standards require protection of *designated uses* as well as existing uses." *Id.* It nonetheless acquiesced to the amendments as,

under § 1292 of SMCRA, the "amendments must be construed and implemented consistent with the CWA, NPDES regulations, and other relevant environmental statutes." AR 209. OSM expressed similar concerns. In its findings on the effect of adding the material damage definition, the OSM stated that its approval was "based upon West Virginia implementing this new definition consistent with its explanation provided with the proposed amendment . . . . Should we later find that this definition is not being implemented in a manner consistent [with the explanatory letter], OSM may revisit this finding." AR 220.

This Court shares these concerns. Nevertheless, in reaching the decision to reject Plaintiffs' argument, the Court keeps in mind the standard of review it must apply in reviewing OSM's approval of the amendments. In light of the foregoing basis for its finding that the definition is no less stringent than the SMCRA and no less effective than the federal regulations, OSM's approval—conditioned on West Virginia's implementation of the material damage definition in line with its water quality standards—is based on a "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 164. Accordingly, the Court finds there was no clear error of judgment in OSM's findings on this issue.[1]

---

[1] In addition, the phrase contested by the Plaintiffs is "existing *conditions* and uses." The parties in their briefing and West Virginia and OSM in their documentation on the amendments focus on the significance of the word "uses." This Court also finds significance in the term "existing conditions." The term, unlike uses, does not have a corresponding definition to be incorporated from the state water quality standards. Neither OSM nor the State address the import of the phrase to the material damage definition; however, in their respective explanations for approval of the amendments, both entities state that the word "material" should be given its plain meaning. Following a similar reasoning, to the Court, "existing conditions" means exactly what it says. Existing conditions are the conditions of a receiving water at the time of a CHIA analysis. Any application of the amended material damage definition must take into consideration any affect a proposed mining project will have on an existing condition of a receiving stream. This implies that, even where an existing use is not adversely affected, an existing condition could be.

**B.    The Amendments Do Not Violate § 1292 of the SMCRA**

Plaintiffs argue that pursuant to § 1292(a)(3) of the SMCRA, the CHIA must incorporate water quality standards under the CWA as material damage criteria. Plaintiffs cite *In re Surface Mining Regulation Litigation*, 627 F.2d 1346 (D.C. Cir. 1980), to support their argument. In that case, interim regulations promulgated under the Act by the Secretary were subject to challenges by numerous parties. *In re Surface Mining Regulation Litigation*, 627 F.2d at 1350. Among these were challenges to the interim regulations establishing effluent limitations and water quality standards for surface and underground mining. *Id.* at 1366. The plaintiffs argued that these provisions "substantially conform[ed] to Environmental Protection Agency (EPA) practice under the Federal Water Pollution Control Act but omit[ted] three 'vital' elements of the EPA's regulatory framework" and, therefore, did not comply with § 1292(a)(3). *Id.* The D.C. Circuit agreed. It found that "where the Secretary's regulation of surface coal mining's hydrologic impact overlaps EPA's, the Act expressly directs that the Federal Water Pollution Control Act and its regulatory framework are to control so as to afford consistent effluent standards nationwide." *Id.* at 1367.

Here, Plaintiffs assert that this conclusion supports their argument that the Secretary erred in granting approval. By failing to incorporate impacts on designated uses in the definition of material damage, Plaintiffs argue, West Virginia's program amendments conflict with the broader CWA framework by not including the "numeric criteria designed to protect designated uses of a water resource that are not existing uses." *Pls.' Mem. in Supp. Pls.' Mot. Summ. J.* 11, Doc. 46. In addition, Plaintiffs note, the inclusion of "long term" and "permanent" in the material damage definition incorporates a frequency or duration component, in contravention of the CWA regulatory framework. *Id.* at 11–12. Lastly, Plaintiffs argue that the amendments do not comply with CWA

TMDL requirements, and do not consider the impact of proposed mining operations on West Virginia's "303(d)" list of impaired waters. *Id.* at 12–13.

The Court finds that the plaintiffs' application of the principle of *In re Surface Mining Litigation* to the West Virginia program amendments conflates the SMCRA and the CWA. In the D.C. Circuit case, the challenged regulations were effluent limitations, which directly overlapped with the EPA's regulatory framework under the CWA. In contrast, at issue here is the definition of material damage used in the CHIA requirement under the SMCRA. This is a permitting process completely separate from the NPDES permitting process under the CWA. If an SMCRA permit is granted because material damage is not likely to result from the proposed mining operation, an NPDES permit could still be denied if the proposed action may result in violations of the water quality standards. *Memo. in Supp. Fed. Def.'s Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. Summ. J.* 12, Doc. 58. A finding of no material damage will not insulate a permittee from a CWA NPDES violation. Furthermore, the phrase defined is *material* damage to the hydrologic balance outside the permit areas. The terms "long term", "permanent", and "significant adverse impact" are all reasonable interpretations of the term material damage. In its analysis of the inclusion of these words in the definition, OSM concluded they give "reasonable meaning to 'material' damage." AR 220. It further concluded that where an individual event has an

> enormous magnitude and impact that would certainly qualify as material damage to the hydrologic balance outside the permit area, there are numerous performance standards that could be cited in enforcement actions in such cases to mandate corrective measures under approved State programs. Further, OSM does not view the proposed State definition as limiting West Virginia's ability to cite the State counterpart (CSR 38-2-14.5) to 30 CFR 816.41(a) and 817.41(a) for causing material damage to the hydrologic balance outside the permit area in such cases.

*Id.* Again, the Court finds OSM's reasoning for its approval of the amendments to be a "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 164. In contrast, Plaintiffs' attempt to have every violation of water quality standards, no matter how temporary or minor, qualify as material damage impermissibly conflates the requirements of the CWA with what is, ostensibly, a design tool for the SMCRA.

### IV. Conclusion

For the approved amendments to be vacated, the alterations to West Virginia's program must be shown to be less stringent than the SMCRA and less effective than the federal regulations or that the Secretary's decision to approve the amendments was a clear error in judgment. Plaintiffs have not met this burden. West Virginia's material damage definition does not supercede, amend, modify, or repeal the Clean Water Act. The OSM has provided an adequate basis for its approval, and this Court, in spite of any reservations it may have regarding the amendments, must concur. The Court **FINDS** that the Secretary, in its explanation for approving the West Virginia amendments, made a "rational connection between the facts found and the choice made." *Burlington Truck Lines*, 371 U.S. at 164. Therefore, Plaintiffs' motion for summary judgment is **DENIED** and Defendant's and Intervenors' motions are **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: January 3, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE